IN THE

# United States Court of Appeals
# for the Eleventh Circuit

_____

**Case Nos. 22-12936 & 22-12937**

_____

TB Food USA, LLC,

*Plaintiff/Appellee/Cross-Appellant,*

v.

American Penaeid, Inc., et al.,

*Defendants/Appellants/Cross-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

_____

**INITIAL BRIEF OF APPELLANTS/CROSS-APPELLEES**

**HOLLAND & KNIGHT LLP**
Amit Agarwal
Steven Jedlinski
Sarah Molinoff
Brent Cooper
315 South Calhoun St., Ste. 600
Tallahassee, FL 32301
(850) 425-5611

*TB Food USA, LLC v. American Penaeid, Inc., et al.,*

Case Nos. 22-12936 & 22-12937

## <u>CERTIFICATE OF INTERESTED PERSONS AND</u><br><u>CORPORATE DISCLOSURE STATEMENT</u>

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure and Rules 26.1-1, 26.1-2, and 27-1(a)(9) of the Rules of the United States Court of Appeals for the Eleventh Circuit, undersigned counsel for Appellants-Cross Appellees and for Appellee-Cross Appellant gives notice of the following trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal:

American Mariculture, Inc., Defendant-Appellant and Cross-Appellee;

American Penaeid, Inc., Defendant-Appellant and Cross-Appellee;

Amit Agarwal, Esq., counsel for Appellants-Cross Appellees;

Archer & Greiner, P.A., counsel for Appellee-Cross Appellant;

Randall Aungst, Third-Party Defendant;

Melville G. Brinson, III, Esq., counsel for Appellants-Cross Appellees;

Brenton H. Cooper, Esq., counsel for Appellants-Cross Appellees;

Brian Gargano, Esq., counsel for Appellee-Cross Appellant;

Kenneth Gervais, Third-Party Defendant;

Neil Gervais, co-founder of Plaintiff Primo Broodstock, Inc.;

Holland & Knight LLP, counsel for Appellants-Cross Appellees;

*TB Food USA, LLC v. American Penaeid, Inc., et al.,*

Case Nos. 22-12936 & 22-12937

Asher Knipe, Esq., counsel to Defendants Advanced Hatchery Technology, Inc. and Charles T. Tuan;

Knott, Ebelini Hart, counsel to Defendants Advanced Hatchery Technology, Inc. and Charles T. Tuan;

Steven Jedlinski, Esq., counsel for Appellants-Cross Appellees;

Justin Mazzara, Esq., counsel to Third-Party Defendant Kenneth Gervais;

Melville G. Brinson III, P.A., counsel to Appellants-Cross Appellees;

Magistrate Nicholas Mizel, United States District Court Magistrate Judge;

Sarah Molinoff, counsel for Appellants-Cross Appellees;

Brian Morera, Esq., counsel to Appellee-Cross Appellant;

Patrick J. O'Connor, Esq., counsel to Appellants-Cross Appellees;

O'Connor & Hernandez, counsel to Appellants-Cross Appellees;

Jianjang Ou, Esq., counsel to Appellee-Cross Appellant;

Pavese Law Firm, counsel to Appellee-Cross Appellant;

PB Legacy, Inc., Plaintiff and Counter-Defendant;

Robin Pearl, Defendant-Appellant and Cross-Appellee;

Primo Broodstock, Inc., Plaintiff and Counter-Defendant;

Judge John J. Steele, United States District Court Judge;

TB Food USA, LLC, Plaintiff-Appellee and Cross-Appellant;

Chené Marie Thompson, Esq., counsel to Appellee-Cross Appellant; and

*TB Food USA, LLC v. American Penaeid, Inc., et al.,*

Case Nos. 22-12936 & 22-12937

Thomas Woodrow, Esq., counsel for Appellants-Cross Appellees.

The undersigned certify that no publicly held company has an interest in the outcome of this appeal.

Dated:  March 7, 2023                    Respectfully submitted,

                                         /s/ *Amit Agarwal*
                                         Amit Agarwal

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellants respectfully submit that oral argument would aid the Court's assessment of this case, which raises important issues pertaining to the jurisdiction of magistrate judges, the scope of the federal Defend Trade Secrets Act and its state-law analogue, and the principle against double recovery.

## **TABLE OF CONTENTS**

**Page**

STATEMENT OF JURISDICTION ........................................................................ 1

STATEMENT OF THE ISSUES ........................................................................... 2

STATEMENT OF THE CASE ............................................................................... 3

SUMMARY OF THE ARGUMENT .................................................................... 14

ARGUMENT ...................................................................................................... 18

    I. The Magistrate Judge Lacked Authority to Preside Over Critical
    Phases of the Trial. .......................................................................... 18

  A.   Legal Background ........................................................................ 18

  B.   Factual Background ..................................................................... 22

  C.   Analysis ...................................................................................... 25

    II.    The District Court Erred in Denying Defendants' Motion for
    Judgment as a Matter of Law as to the Trade Secret Claims .................... 30

  A.   The district court's post-trial order failed to specifically identify a
    trade secret that forms a legally permissible basis for the jury's
    verdict, and it could not properly assess the sufficiency of the
    evidence without identifying some such secret. ..................................... 30

  B.   The district court erred as a matter of law insofar as it allowed the jury
    to find that bred animals may be trade secrets ....................................... 34

  C.   The district court erred insofar as it held that trade secret liability may
    be predicated on alleged misappropriation of a valid trade secret in
    "the underlying Primo shrimp genetics." ............................................ 39

    1.   DNA sequences ....................................................................... 40

    2.   Primo's family-grouping information ...................................... 44

    III.    The District Court Erred in Allowing a Double Recovery. ............... 50

CONCLUSION ................................................................................................... 56

STATEMENT OF COMPLIANCE ...................................................................... 58

CERTIFICATE OF SERVICE ............................................................................ 59

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*AcryliCon USA v. Silikal GmbH*,
  985 F.3d 1350 (11th Cir. 2021) ...........................................................14

*Am. Red Cross v. Palm Beach Blood Bank*,
  143 F.3d 1407 (11th Cir. 1998) ......................................38, 41, 43, 45

*Association for Molecular Pathology v. Myriad Genetics*,
  569 U.S. 576 (2013)...........................................................................40, 41

*Bismark v. Fisher*,
  213 F. App'x 892 (11th Cir. 2007) ......................................20, 21, 27

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981) ...........................................................21

*Brown v. United States*,
  748 F.3d 1045 (11th Cir. 2014) ..............................................18, 19, 20

*Burton v. Schamp*,
  25 F.4th 198 (3d Cir. 2022) ......................................................*passim*

*Composite Marine Propellers v. Van Der Woude*,
  962 F.2d 1263 (7th Cir. 1992) ............................................................32

*Coquina Invs. v. TD Bank, N.A.*,
  760 F.3d 1300 (11th Cir. 2014) ..........................................................55

*Day v. Persels & Assoc's*,
  729 F.3d 1309 (11th Cir. 2013) ..........................................................20

*Democratic Republic of the Congo v. Air Capital Grp.*,
  614 F. App'x 460 (11th Cir. 2015).....................................................54

*Farmers Edge v. Farmobile*,
  970 F.3d 1027 (8th Cir. 2020) ............................................................38

*Fowler v. Jones*,
  899 F.2d 1088 (11th Cir. 1990) ..............................................14, 21, 30

*Freytag v. Comm'r*,
    501 U.S. 868 (1991)...............................................................................18

*Gomez v. United States*,
    490 U.S. 858 (1989)...............................................................................20

*Harris v. Polk Constr. Co.*,
    138 F.3d 365 (8th Cir. 1998) ...............................................................26

*Mallet & Co. Inc. v. Lacayo*,
    16 F.4th 364 (3d Cir. 2021) .................................................................34

*McNab v. J & J Marine, Inc.*,
    240 F.3d 1326 (11th Cir. 2001) ...........................................................26

*MDS (Canada) Inc. v. Rad Source Techs.*,
    720 F.3d 833 (11th Cir. 2013) .............................................................47

*Medina v. District of Columbia*,
    643 F.3d 323 (D.C. Cir. 2011)..............................................14, 50, 54

*Midwest Oilseeds v. Limagrain Genetics Corp.*,
    231 F. Supp. 2d 942 (S.D. Iowa 2002) ...............................................38

*North Carolina Farm Partnership v. Pig Improvement Co.*,
    593 S.E.2d 126 (N.C. App. 2004)........................................................37

*Otogenetics Corp. v. Omega Biosciences*,
    No. 1:15-CV-2697, 2017 WL 11580438 (N.D. Ga. 2017)...................34, 46, 47

*Peat v. Vanguard Research*,
    378 F.3d 1154 (11th Cir. 2004) ....................................................33, 38

*Pioneer Hi-Bred Int'l v. Holden Found. Seeds*,
    Civ. No. 81-60, 1987 WL 341211 (S.D. Iowa Oct. 30, 1987)…………………38

*Roell v. Withrow*,
    538 U.S. 580 (2003).......................................................................*passim*

*St. Luke's Cataract & Laser Inst. v. Sanderson*,
    573 F.3d 1186 (11th Cir. 2009) ....................................................14, 49

*Stern v. Marshall*,
    564 U.S. 462 (2011)...................................................................................18

*Turret Labs USA v. CargoSprint*,
    2022 WL 701161 (2d Cir. Mar. 9, 2022)...........................................38

*U.S. EEOC v. Consol Energy, Inc.*,
    860 F.3d 131 (4th Cir. 2017) ...............................................................26, 56

*United States v. Arthrex, Inc.*,
    141 S. Ct. 1970 (2021).............................................................................18

*United States v. De La Torre*,
    605 F.2d 154 (5th Cir. 1979) ..............................................................21, 27, 30

*United States v. Desir*,
    257 F.3d 1233 (11th Cir. 2001) .....................................................21, 25, 27, 30

*Wellness Int'l Network v. Sharif*,
    575 U.S. 665 (2015)...................................................................................21

*Yates v. United States*,
    574 U.S. 528 (2015) ...........................................................................36, 37

*Yellowfin Yachts v. Barker Boatworks*,
    898 F.3d 1279 (11th Cir. 2018) ........................................................33

*Yoder Bros. v. Cal.-Fla. Plant Corp.*,
    537 F.2d 1347 (5th Cir. 1976) .......................................................42, 43, 48

**Statutes**

18 U.S.C. § 1832....................................................................................37

18 U.S.C. § 1836..............................................................................33, 38, 41, 52

18 U.S.C. § 1839............................................... 33, 35, 36, 38, 41, 42, 47, 48

28 U.S.C. § 636 ................................................... 19, 20, 26, 27, 28, 29

28 U.S.C. § 1291 ................................................................................1, 21

28 U.S.C. § 1331 ....................................................................................1

28 U.S.C. § 1332 ...........................................................................................1

28 U.S.C. § 1367 ...........................................................................................1

Lanham Act ...........................................................................................11, 13

**Other Authorities**

22 Am. Jur. 2d Damages § 40 ...............................................................50, 51

David B. Resnik, *DNA Patents and Human Dignity*, 29 J.L. Med. &
    Ethics 152, 158 (2001) .......................................................................42

Fed. R. App. P. 4 ...........................................................................................1

Fed. R. Civ. P. 73 ...............................................................................19, 27, 28

## <u>STATEMENT OF JURISDICTION</u>

This is an appeal from a final judgment of the United States District Court for the Middle District of Florida in a civil case. DE554. The district court's jurisdiction was invoked under 28 U.S.C. §§ 1331, 1332(a), and 1367(a). DE20:2; DE405:2. Final judgment was entered on August 5, 2022. DE554. Appellants filed a timely notice of appeal on August 31, 2022. DE560; *see* Fed. R. App. P. 4(a)(1). This Court's appellate jurisdiction is invoked under 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

1.  Whether the magistrate judge lacked statutory and constitutional authority to preside over critical phases of the trial.

2.  Whether the district court erred as a matter of law in holding that Plaintiff adduced legally sufficient evidence that Defendants misappropriated a protectable trade secret in violation of the Defense of Trade Secrets Act and the Florida Uniform Trade Secrets Act.

3.  Whether the district court erred in awarding Plaintiff an impermissible double recovery.

## STATEMENT OF THE CASE

### A.    Statement of the Facts

**Tin Corp.**  Around 1995, Neil Gervais, his cousin Ken Gervais, and John Birkett formed a business in Ecuador called Tin Corp.  DE466:83, 99.[1]  Neil was the company's biologist, and he wanted to breed shrimp that were naturally resistant to a disease known as White Spot.  DE466:83-84, 100.  At the time, most shrimp breeders "were trying to keep the animals away from diseases."  DE466:112.  Neil took a different approach.  He deliberately exposed shrimp to White Spot "to find out which animal could possibly have a tolerance to it."  DE466:84.

At least two or three other companies had taken a similar approach, and Neil thought that they—along with Tin Corp.—collectively deserved credit for Ecuador's stellar shrimp production.  DE466:83-84; DE474:181-83, 189-90.  As Neil saw it, however, Tin Corp. stood out:  "No one [else] had ever exposed" so many shrimp "to so much disease."  DE466:111.  Neil's "killing fields" lived up to their name, resulting in "millions and millions of shrimp dying."  DE466:103, 110.  But some survived, and those formed the basis for Tin Corp.'s stocks.

In the early 2000s, the Gervais cousins sold their interest in Tin Corp., without retaining any interest in the animals Tin Corp. bred.  DE467:166-68.  For the next

---

[1] "DE" refers to entries in the district court's docket.  "DX" refers to Defendants' exhibits, available at DE589.

10 years, those lines of shrimp were owned, maintained, and developed by others. DE467:167-68; DE474:156, 189.

**Primo.** Around 2009 or 2010, the Gervais cousins started Primo Broodstock, a new shrimp breeding company. DE468:12. Both were equal partners. Neil was the biologist, and Ken ran the business. DE468:154; DE469:115. Primo acquired its founding stocks from Tin Corp. for less than $100,000. DE467:168-69. Thanks in part to the work Tin Corp. had done over the preceding ten years, those shrimp were already resistant to White Spot; Primo "cleaned" and maintained them, but otherwise did nothing substantial to improve their disease-resistance. DE467:175; DE474:189.

Primo engaged in selective breeding, but Neil and Ken agreed that "under no circumstances" did it have the tools to manipulate or modify genetics. DE467:177; DE469:115. There were "some companies in Europe that were actually changing the DNA of shrimp," but Primo wasn't "even approaching that." DE469:115. In fact, Primo never even knew of any specific information encoded into the DNA of its shrimp, because "Primo never engaged in DNA testing." DE469:115; DE467:199; DE468:45-46.

Primo's broodstock made their way all over the world. *E.g.*, DE468:11-12 (Philippines); DE467:204 (Mexico). Primo sold shrimp without requiring the buyers to sign a confidentiality agreement or a restriction on breeding. DE468:12.

4

However, Primo sought to prevent customers from replicating Primo shrimp by selling males from one family and females from another family. That made it difficult to mate the offspring without developing problems associated with inbreeding. Primo referred to this method as a "genetic lock." DE467:36-37; DE469:240. DE474:127-28. Anyone could use genetic testing to get information about DNA in the shrimp Primo sold. One need not have a live or even a whole shrimp; testing can be done on legs (called "pleopods") of dead shrimp. DE473:122; DE474:90-91; DE474:128.

### Agreements with AMI.

*Nondisclosure Agreement.* In 2014, Primo and American Mariculture, Inc. (AMI) started discussing a potential business opportunity. Primo needed grow-out space for its broodstock, and AMI operated an indoor grow-out facility for shrimp. DE306:3. In December 2014, Primo and AMI executed a Mutual Nondisclosure Agreement (NDA) to facilitate their discussions. DXA:1.

The NDA required the parties not to disclose "Confidential Information" to third parties or to use such information "for any purpose other than to carry out discussions concerning, and the undertaking of, the Relationship." DXA:1. "Confidential Information" was defined to mean certain "information, technical data, or know-how, including, but not limited to, that which relates to" products (as opposed to the products themselves). Confidential Information was defined not to

include, among other things, "information, technical data, or know how which … (ii) is or becomes publicly available through no fault of, or without violation of any duty of confidentiality of, the receiving party, (iii) is independently developed by the receiving party, provided that it was not derived from any Confidential Information; … or (v) is approved in writing by the disclosing party for release." Commitments under the NDA terminated on the later of five years after the date of the agreement or three years from the date on which Confidential Information was disclosed. DXA:1 ¶8.

*Grow-Out Agreement.* In January 2015, Primo and AMI entered into the Grow-Out Agreement (GOA). The "specific primary goal" of the agreement was "to use a defined portion of AMI grow-out capacity to produce broodstock for Primo for sale to third parties." DXB:1. The "second goal" was "to develop a shrimp genetically selected for improve[d] performance in hyper-intensive grow-out systems." DXB:1 (emphasis omitted). The GOA included six "recitals" and 32 "agreements," discussed (as relevant) in greater detail below. DXB:1-4.

The parties subsequently had a number of disputes concerning performance under the GOA. For example:

- Paragraph 6 of GOA provides: "Payment for shipment of any animals plus transport and packing expenses will be due upon shipment." DXB:2. As Ken Gervais admitted, Primo "was not making payments when the animals were shipped." DE469:152; *see* DE468:37.

- Paragraph 18 of the GOA provides: "Primo will supply AMI at no cost with 100 breeder pairs (200 animals) every three months during the term of this agreement." DXB:3 ¶18. At trial, it was undisputed that Primo did not do that. *E.g.*, DE479:120. Ken Gervais testified that was because "Mr. Pearl didn't need the animals." DE469:128. But Mr. Gervais was then shown three emails demanding breeders, and counsel asked: "[Y]ou admit now that it wasn't that he didn't want them, right, he clearly wanted breeders during this time period?" Mr. Gervais answered: "Okay." DE469:142; *see id.* at 131-42; DXN; DXP; DXQ; *see also* DE466:64 (counsel for PB Legacy admits that "[t]hings did happen that caused shrimp to not be delivered to AMI" as promised).

- Paragraph 11 of the GOA provides that "Primo will use state of the art genetic selection techniques to develop a superior performing shrimp" for AMI. DXB:2. No such program was developed. DE471:224-26. At trial, Ken Gervais admitted that, 16 months after executing the GOA, Primo was just "starting to do the process of generating … what was deemed important information" for that custom genetic program. DE469:154.

- Paragraph 3 of the GOA provides: "In the event an animal cannot be sold in an agreed upon time or size the animal will be killed and sold as dead fresh or frozen shrimp product into the market." DXB:1. Neil Gervais conceded that Primo "didn't take the animals out on time," and "didn't sell the animals on time." DE468:38. But when AMI notified Primo that it intended to harvest the Primo shrimp at its facility, Primo filed suit against AMI in state court to enjoin AMI from harvesting the shrimp. DE469:156; *see also* DE306:5.

*Term Sheet/Handwritten Agreement.* On January 28, 2016, Mr. Pearl met Randall Aungst (a Primo employee) to negotiate a resolution of Primo's lawsuit against AMI. Ken Gervais participated by telephone. DE469:47-48, 290; DE470:33. The result of the meeting was the so called "Term Sheet" or "Handwritten Agreement," a one-page, untitled document signed by Mr. Aungst (on behalf of Ken Gervais) and Mr. Pearl. DE470:44. The Term Sheet includes nine

numbered terms and two unnumbered terms.  DXC; DE469:96-100; DE470:114-19 (discussing terms).

At trial, the parties disputed the import of the Term Sheet.  Several points warrant mentioning:

- Item 6 of the Term Sheet includes the phrases "Release Lawsuit" *and* "Terminate Agreement."  DXC.  Nevertheless, Ken Gervais testified that he did not agree to terminate any agreement, and that the phrase "Terminate *Agreement*" meant "I was terminating the *lawsuit*."  DE469:99 (emphasis added).

- At trial, Ken Gervais testified, "I never admitted [the] Grow-Out Agreement was terminated" by the Term Sheet.  DE469:157.  In an earlier deposition, however, Mr. Gervais testified:  "We had a mutual disagreement and we terminated it [i.e., the GOA]."  DE469:157.  In addition, Ken Gervais was the President of Primo; and on August 30, 2016, counsel for Primo sent Mr. Pearl a letter advising that, "on or about January 28, 2016, the parties entered into an untitled contract, *thereby terminating their business relationship*."  DXF:2 (emphasis added).

- Item 7 of the Term Sheet stated that "AMI will *not* destroy animals."  DXC (emphasis added).  Ken Gervais admitted that "[t]here was no end date stated there"—i.e., in connection with AMI's obligation not to destroy Primo's animals.  DE469:100.  Consistent with the text of Item 7, Mr. Aungst testified that, during the meeting at which the Term Sheet was negotiated, there was no suggestion that Mr. Pearl was *obligated to destroy* the Primo animals after April 30 if Primo couldn't remove them.  DE470:120.  Nevertheless, Mr. Aungst testified that he later called Mr. Pearl to clarify that AMI would destroy any animals Primo left there after April 30.  According to Mr. Aungst, Mr. Pearl then orally agreed to do exactly what he promised *not* to do in Item 7 of the signed agreement.  DE470:45, 47-48; *see also* DXB:4 ¶ 32 (provision of GOA providing that "no subsequent agreement relative to the subject matter hereof or modification of this agreement shall be binding unless reduced to a writing signed by both parties hereto").

- Item 8 of the Term Sheet stated that "AMI will give Primo [until] April 30th 2016 to remove all animals."  DXC.  At trial, Ken Gervais acknowledged that

"we agreed to be out of there [i.e., AMI's facility] by April 30th." DE469:101. As Primo admitted, however, "the shrimp were never retrieved by Primo and remained at AMI's facility." DXF:2; DE469:57-58.

Primo's breaches (DE465:19) of the GOA and the Term Sheet caused AMI significant losses. DE471:83. Jeremy Beck, a former director of AMI, testified that Primo complied with about 10% of its obligations under the GOA and "constantly failed" to deliver the required shrimp. DE479:117, 120. AMI was using numerous tanks to grow out broodstock for Primo, which entailed significant costs, but "shipments would never come along so we'd never get any money for them." DE479:121. After the Term Sheet was signed, Primo "did nothing for the next two or three months" to remove their animals from AMI's facility, and AMI continued incurring costs to maintain those shrimp on its premises. DE479:125. Mr. Pearl estimated the damages resulting from Primo's breaches of the GOA and Term Sheet at $4 million. DE471:277-78; *see* DE479:120.

**API.** Primo had about 100,000 shrimp on AMI's facility when the Term Sheet was signed in January 2016. They "ended up moving about 20,000" by April 30, 2016. DE471:138. Ken Gervais agreed that those shrimp were now "their [AMI's] shrimp," but—as noted above—took the view that AMI had no choice but to kill "their" shrimp and sell them as food. DE469:59.

Neil recommended using Dr. Franklin Perez to do a genetic analysis of the shrimp on AMI's farms and to help separate them into families. DE467:133;

DE470:285-86.  To the best of Neil's knowledge, there was "no restriction" that barred such testing, and Ken "certainly didn't say you can't," although he didn't say you could do it either.  DE467:132.

At that point, the shrimp remaining on AMI's farm included the shrimp Primo left behind as well as shrimp from two other sources—SIS and Earth Care. DE472:37.  Based on Dr. Perez's genetic analysis, those shrimp were divided into 16 groups.  DE470:286.  Those became the founding stocks for American Penaeid, Inc. (API) (DE470:286), a new company owned by AMI and engaged in the business of selling broodstock.  DE470:181; DE471:72.

After April 30, 2016, API sold broodstock to former customers of Primo Broodstock.  DE472:22-23.  Primo had entered into an exclusive relationship with a Chinese company (Haimao), and it was not selling to those customers at that time. DE472:23.  In fact, Primo never even tried to sell to those customers again. DE472:26.  API has never directly competed with Primo in the Chinese market, although Haimao competes with other hatcheries to which API has sold shrimp. DE472:22, 25-28.

### B.    Course of Proceedings and Disposition Below

Primo Broodstock[2] filed a nine-count amended complaint against AMI, API, and Mr. Pearl ("Defendants"), asserting claims for breach of contract, common-law conversion, defamation, trade secret misappropriation under the federal Defend Trade Secrets Act (DTSA) and its state-law analogue (FUTSA), unfair competition in violation of the federal Lanham Act, unfair competition in violation of two Florida laws, and unjust enrichment. *Id.*

AMI filed a counterclaim against Primo Broodstock, Ken Gervais, and Mr. Aungst, asserting claims for breach of contract and fraudulent inducement.  AMI also sought a declaration that the Term Sheet required Primo Broodstock to remove its animals from AMI's facilities by April 30, 2016, and that the shrimp were AMI's property.  DE80.

Following several rounds of briefing, the court granted Defendants' request for partial summary judgment as to Plaintiffs' conversion and unjust enrichment claims, finding that these claims were preempted by the FUTSA claim.  DE135.  The court also granted summary judgment in favor of PB Legacy, Ken Gervais, and Mr. Aungst on certain of AMI's counterclaims.  DE285; DE307.

---

[2]  In connection with a complex series of transactions described by the district court, TB Food, Inc. (hereinafter, "Plaintiff") was later added to the case and Primo Broodstock changed its name to PB Legacy.  DE306:8-9.  PB Legacy was later dismissed from the action on Defendants' motion, leaving TB Food as the sole remaining plaintiff.  DE306.

The case proceeded to trial and culminated in a jury verdict. As detailed below, a magistrate judge presided over the last three days of trial. In doing so, the magistrate judge instructed the jury on multiple issues of law. The magistrate judge also decided to accept the verdict and discharge the jury without seeking additional clarification of the damages award, notwithstanding a dispute between the parties concerning the interpretation of the verdict.

On Count I, the jury found that Plaintiff had proven that AMI breached the NDA and GOA, but that AMI had proven its affirmative defense under the *in pari delicto* doctrine. On Count III, the jury found that Plaintiff had not proven its defamation claim against AMI, but did award $500,000 to Plaintiff for its defamation claim against API and Mr. Pearl. The jury found that Plaintiff had not proven a violation of the DTSA or FUTSA by AMI, but ruled in Plaintiff's favor on both claims against API and Pearl (Counts IV and V), awarding $4,950,000.00 in compensatory damages under each trade secrets count. The jury did not award exemplary damages on either trade secrets claims. On Plaintiff's Lanham Act claim, Count VI, the jury found that Plaintiff had not proven a violation by AMI, but awarded $100,000 in compensatory damages against API and Pearl. Finally, the jury found that Plaintiff had not proven its Florida unfair competition claims against any defendant. DE553:3-4.

12

On AMI's counterclaim against PB Legacy, the jury found that PB Legacy had breached the GOA, but also found that PB Legacy proved its affirmative defenses and awarded no damages to AMI.  DE465:19.

The parties filed post-trial motions, including motions for judgment as a matter of law.  As relevant here, the district court denied Defendants' renewed motion for judgment as a matter of law as to the DTSA and FUTSA claims, and it rejected Defendants' argument "that the judgment in this case contains manifest legal error in that [it] fails to account for the duplicative recovery occasioned by the jury's identical award of damages on Plaintiff's 'twin trade secret claims.'" DE553:53, 7-15, 54-57.

Defendants filed a timely notice of appeal.  DE560.

### C.    Standards of Review

1.  Whether a magistrate judge had jurisdiction to conduct a civil proceeding is a question of law reviewed *de novo*.  *See Burton v. Schamp*, 25 F.4th 198, 205 n.9 (3d Cir. 2022); *Fowler v. Jones*, 899 F.2d 1088, 1092-93 (11th Cir. 1990).  A challenge to the magistrate judge's authority based on the absence of a valid consent may be raised for the first time on appeal.  *Id.* at 1092 (rejecting contention that "plaintiff's failure to object to the magistrate's actions at any time during the trial amounted to a waiver and that the plaintiff is therefore precluded from raising this argument on appeal").

13

2.  This Court reviews *de novo* the denial of a motion for judgment as a matter of law.  *AcryliCon USA v. Silikal GmbH*, 985 F.3d 1350, 1366  (11th Cir. 2021). Such a motion should be granted "as long as there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party."  *Id.*

3.  The Court of Appeals "review[s] the underlying double recovery question *de novo*" insofar as that question involves an issue of law, *Medina v. District of Columbia*, 643 F.3d 323, 326 (D.C. Cir. 2011), such as the legal test for determining whether two awards are duplicative.  A factual determination regarding duplicative damages is reviewed for clear error.  *St. Luke's Cataract & Laser Inst. v. Sanderson*, 573 F.3d 1186, 1200 n.17 (11th Cir. 2009).

## <u>SUMMARY OF THE ARGUMENT</u>

**1.**  The district court did not secure the knowing and voluntary consent of the parties before authorizing a magistrate judge to unilaterally preside over non-ministerial aspects of the trial.  The law of this Circuit holds that answering jury questions—including the jury's question about how to calculate damages—is a critical phase of the trial.  Nor was it a ministerial decision to determine that there was no ambiguity in the verdict form and to discharge the jury without seeking readily available clarification that could have resolved an important and manifest dispute between the parties about how to interpret the verdict.

14

Other options were available.  The court could have followed the simple and straightforward procedures mandated by Congress and the federal judiciary to ensure that the constitutional right at issue here is knowingly and voluntarily waived. Absent that, it could have asked for another Article III judge to take the district judge's place, remotely supervised the magistrate judge's on-site handling of any non-ministerial matters, or delayed the trial.

The absence of a valid consent divested the magistrate judge of jurisdiction to preside over the last three days of the trial, including critical phases preceding and culminating in acceptance of the jury verdict on which the judgment is predicated. In such circumstances, this Court's precedents hold that the proper remedy is to vacate the judgment and remand for a new trial.

**2.**  Defendants are entitled to judgment as a matter of law on the federal and state trade secret claims.

**A.**  The district court erred insofar as it allowed the jury to find that bred animals may qualify as "trade secrets" under the DTSA and FUTSA.  Both statutes define the term "trade secret" to mean certain kinds of "information."  That textual constraint has judicially enforceable outer limits.  Here, dictionary definitions, ordinary English usage, and traditional tools of interpretation point to the same conclusion:  One can have information *about* a bred animal, but a bred animal itself is *not* information.

15

That distinction matters.  By conflating particular kinds of information about the abandoned shrimp with the shrimp themselves—and then lumping together qualitatively different kinds of information (and even non-information) under vague but impressive-sounding phrases like "underlying shrimp genetics"—Plaintiff invited the jury to mix and match statutory elements for different alleged trade secrets.  That "kitchen sink" approach to asserting trade secret liability, combined with the district court's refusal to require specificity or weed out statutorily impermissible theories of liability, allowed Plaintiff to gloss over demonstrable legal and evidentiary problems with its proof.

In short, the district court's legal error involving a threshold question of statutory interpretation, standing alone, warrants reversal.

**B.**  At any rate, and as explained at length herein, Plaintiff did not and could not prove that any specific information about the shrimp it abandoned on AMI's property (1) was a trade secret, (2) was owned or possessed by Primo at the time in question, and (3) was misappropriated by Defendants.

That is not to say that Primo had no remedy for the alleged breach of contract that lies at the heart of this case.  Breeders do valuable work, and the law gives them a broad range of tools to protect their labor.  In this case, for example, Plaintiff's first claim for relief alleged breach of contract, and its nine-count complaint brought claims for common-law conversion and unfair competition in violation of federal

and state law.   But a breeder may not claim ownership or possession of a "secret" consisting of "the genetic code" of a non-genetically-engineered life form, particularly where (as here) that code is a mystery to the breeder *and* the organism is released to others.

**3.**  The Supreme Court has instructed that the courts can and should preclude double recovery.  Sometimes that principle is hard to apply.  But not always.  It is hornbook law that if a federal claim and a state claim arise from the same operative facts, and seek identical relief, an award of damages under both theories will constitute double recovery.  All the predicates for that rule are present here, and the district court did not find otherwise.  Thus, the district court's duplicative award of damages under both of Plaintiff's duplicative trade-secret theories constitutes an impermissible double recovery.

## ARGUMENT

I.   **The Magistrate Judge Lacked Authority to Preside Over Critical Phases of the Trial.**

   **A. Legal Background**

The Constitution vests "[t]he judicial Power of the United States … in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. Art. III, § 1. "[T]he judges of those courts shall hold their offices during good behavior, without diminution of salary." *Stern v. Marshall*, 564 U.S. 462, 469 (2011). Federal judges are principal officers for purposes of the Appointments Clause. *See* U.S. Const. Art II, § 2, cl. 2; *Freytag v. Comm'r*, 501 U.S. 868, 884 (1991). Accordingly, they "must be appointed by the President with the advice and consent of the Senate." *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1978 (2021).

Magistrate judges are not appointed by the President or confirmed by the Senate. *Brown v. United States*, 748 F.3d 1045, 1052 (11th Cir. 2014). In addition, they "do not hold life-tenure, nor is their compensation undiminishable." *Id.* at 1058. "Therefore, magistrate judges, as entities outside Article III, cannot exercise 'the judicial Power of the United States." *Id.* at 1069. At a minimum, statutes purportedly authorizing magistrate judges to exercise "the judicial power of the United States" should be narrowly construed to avoid or minimize the "serious

18

constitutional problem" posed by such departures from the constitutional text. *Id.* at 1058; *see also id.* at 1068-72.

Section 636(c)(1) of Title 28 provides that, "[u]pon the consent of the parties, a full-time United States magistrate judge … may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case." "Section 636(c)(2) establishes the procedures for a § 636(c)(1) referral." *Roell v. Withrow*, 538 U.S. 580, 586 (2003). It provides:

> (2) If a magistrate judge is designated to exercise civil jurisdiction under paragraph (1) of this subsection, the clerk of court shall, at the time the action is filed, notify the parties of the availability of a magistrate judge to exercise such jurisdiction. The decision of the parties shall be communicated to the clerk of court. Thereafter, either the district court judge or the magistrate judge may again advise the parties of the availability of the magistrate judge, but in so doing, shall also advise the parties that they are free to withhold consent without adverse substantive consequences. Rules of court for the reference of civil matters to magistrate judges shall include procedures to protect the voluntariness of the parties' consent.

Federal Rule of Civil Procedure 73(b)(1) provides additional instructions on the "Consent Procedure" required:

> (1) In General. When a magistrate judge has been designated to conduct civil actions or proceedings, the clerk must give the parties written notice of their opportunity to consent under 28 U.S.C. § 636(c). To signify their consent, the parties must jointly or separately file a statement consenting to the referral. A district judge or magistrate judge may be informed of a party's response to the clerk's notice only if all parties have consented to the referral.

Consistent with § 636(c)(2), the MDFL's local rules on the reference of civil matters to magistrate judges "include procedures to protect the voluntariness of the parties' consent." Among other procedures, the written consent form authorized by the court, AO 85, explains: "The name of any party withholding consent will not be revealed to any judge who may otherwise be involved with your case."[3]

The requirement of a valid consent is "[a] critical limitation" on the expanded statutory jurisdiction authorized by § 636(c). *Gomez v. United States*, 490 U.S. 858, 870 (1989). This Court has "serious concerns as to the facial constitutionality of § 636(c)." *Brown*, 748 F.3d at 1069. If section 636(c) is facially constitutional, that is so "*because* the act requires that the parties and the district court consent to the transfer of the case to a magistrate and because the district court retains sufficient control over the magistrate." *Day v. Persels & Assoc's*, 729 F.3d 1309, 1323 (11th Cir. 2013) (emphasis added) (cleaned up).

Although § 636(c) and related rules of procedure envision "advance, written consent communicated to the clerk," the Supreme Court has found implied consent "where … the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case before the Magistrate Judge." *Roell*, 538 U.S. at 586, 590. But implied consent will be found only "in

---

[3] *See* AO 85 (Rev. 02/17), Notice, Consent, and Reference of a Civil Action to a Magistrate Judge, https://www.flmd.uscourts.gov/sites/flmd/files/forms/mdfl-ao85-notice-consent-and-reference-of-a-civil-action-to-a-magistrate-judge.pdf, at 2.

certain narrowly circumscribed contexts." *Bismark v. Fisher*, 213 F. App'x 892, 895 (11th Cir. 2007) (per curiam).  In addition, "a litigant's consent—whether express or implied—must still be knowing and voluntary." *Wellness Int'l Network v. Sharif*, 575 U.S. 665, 685 (2015). "[N]otification of the right to refuse the magistrate judge is a prerequisite to any inference of consent ...." *Roell*, 538 U.S. at 588 n.5.

A "magistrate judge inappropriately exercise[s] the authority of an Article III judge at a critical stage of the proceeding by responding to [a] jury's question" without submitting that question to the district judge and then implementing the judge's decision, as such a procedure goes "beyond the simple performance of a ministerial task." *United States v. Desir*, 257 F.3d 1233, 1238 (11th Cir. 2001). That is so even if parties do not object to a magistrate judge receiving the jury's verdict. *United States v. De La Torre*, 605 F.2d 154, 156 (5th Cir. 1979); *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

"If … the magistrate judge exercises jurisdiction without the parties' consent, then the resulting judgment is not final for purposes of § 1291, and appellate jurisdiction is lacking." *Bismark*, 213 F. App'x at 894  (citing *McNab v. J & J Marine, Inc.*, 240 F.3d 1326, 1328 (11th Cir. 2001)).  When a magistrate judge presides over a jury trial without the requisite consent of the parties, the proper remedy is to vacate the judgment and remand for a new trial. *Fowler*, 899 F.2d at 1096.

**B. Factual Background**

This suit was filed in January 2017. DE1. That month, the parties were directed to fill out an initial case management order. DE13. One of the boxes on that form allowed the parties to jointly address whether all parties consent to proceed before a magistrate judge by indicating "yes," "no," or "likely to agree in the future." DE13:5. In subsequent case management reports, the parties jointly checked "no," without having to identify any party or parties who did not consent. DE65:2; DE104:3; DE278:3.

In March 2017, the court issued a nine-page case-management and scheduling order. DE75. That order noted that the parties could consent to proceed before a magistrate judge, and that "[a] party is free to withhold consent without adverse substantive consequences." DE75:9. The same language appeared in a similar order issued in May 2018. DE105:9.

The case proceeded to jury trial in November 2021, and it was submitted to the jury on November 16. DE480:98.

On the afternoon of November 17, the district judge held a session with counsel in which the following colloquy took place:

> THE COURT: Counsel, I've not heard anything from the jury. I wanted to gather because, as you know, although I moved back my flight, apparently, not far enough. I need to be out of here at 3:30. My proposal is that we have the Magistrate Judge who has been assigned to the case take my place in terms of receiving the

verdict from the jury. Judge Mizell is available and, of course, can do that.

What are your thoughts?

MR. BRINSON: We actually informally discussed that, Judge, and we're -- I think we're fine with that.

MS. THOMPSON: That is correct, Your Honor. On behalf of PB Legacy, we would have no objection to that. I know that Magistrate Mizell is familiar with the case.

MR. GARGANO: No objection, no.

THE COURT: Okay. I didn't know of any other way, frankly.

MS. THOMPSON: Right.

THE COURT: So, come 3:30, I'll be gone. And if anything happens from that point on, Judge Mizell will be here….

DE535:13-14.

Magistrate Judge Mizell began presiding over the trial on the afternoon of November 17.  DE535:14.  Upon taking over the gavel, Judge Mizell did not seek or receive consent from counsel or the parties to unilaterally handle non-ministerial aspects of the trial, such as answering jury questions.  Nor did he state for the record his understanding that the parties had consented to his performing any such duties. Instead, he advised counsel that he had received a note from the jury and appeared to assume that he had authority to respond to such notes or inquiries without consulting the district judge or obtaining the voluntary consent of the parties.  No counsel lodged an objection to this procedure.

23

Over the next few days, Judge Mizell responded to five different notes or questions from the jury, including one which asked: "Is there a formula for awarding damages." DE536:14. After consulting with counsel, Judge Mizell resolved that request for guidance by advising the jury to "refer to the evidence of record and the instructions supplied to you by the court." DE536:15.

On the afternoon of November 19, the jury sent a message indicating that it had reached a verdict. DE495:13. Judge Mizell called the jury in, published the verdict, and then asked the clerk to poll the jury. DE495:14-24.

The verdict form included the phrase "Compensatory damages of $4,950,000" twice—once under the federal trade secret claim and again under the state trade secret claim. DE495:18, 19; DE465:9, 12. Some lines on the form were left blank, but on other lines the jury wrote down "zero." *E.g.*, DE495:18, 20, 21.

Judge Mizell then asked if there were any issues to raise before discharging the jury. DE495:24. Counsel agreed that the jury did not need to provide additional clarification about why it sometimes left an amount blank and sometimes put down zero. DE495:24. Judge Mizell reiterated that he "wanted to make sure we didn't have any issues … before we discharge the jury," and defense counsel then raised one such issue:

> MR. BRINSON: Your Honor, I guess the only question we might have is on question 27, the $4,950,000 award and the same amount on question 39, my assumption is that that's a total of $4,950,000, not that amount twice since those are very similar claims.

24

MS. THOMPSON:  Obviously, that would be -- I would have a different assumption.

THE COURT:  No, I don't have -- I mean, what's there is there.  I don't take -- I don't think there's any ambiguity, from the verdict form at least, what's there.  I just wanted to make sure that no one took issue with the fact that sometimes there's a zero and sometimes it's blank.  I think, either way, that means zero.  I just want to make sure all the parties agree [on the blank vs. zero point] before we discharge the jury."

DE495:24-25.

All parties reiterated their agreement on the blank vs. zero point, and the court then discharged the jury without seeking clarification on whether the jury intended to make coextensive or cumulative awards of $4,950,000 on the twin trade secret claims.  DE495:25-27.  The district court subsequently entered two awards of $4,950,000 against API and Mr. Pearl.

**C.  Analysis**

The magistrate judge unilaterally presided over the last three days of the jury trial, taking on the role of the district judge and making non-ministerial decisions of great practical importance.  *See Desir*, 257 F.3d at 1238.  Of particular relevance here, the magistrate judge (1) instructed the jury in response to a question on how to calculate damages; and (2) decided that—notwithstanding an explicit disagreement between the parties about how to interpret the damages portion of the verdict form— there was no "ambiguity" on the verdict form itself and that the jury should be discharged without seeking clarification of whether the jury intended to make

coextensive or cumulative awards. *See, e.g.*, *U.S. EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 147 (4th Cir. 2017);. Neither of these decisions by the magistrate judge was made in consultation with, much less under the supervision of, the district judge; and neither could be undone after the jury was discharged.

Those parts of the trial fell within the scope of § 636(c), which covers "any or all proceedings in a jury or nonjury civil matter," 28 U.S.C. § 636(c)(1). Hence, Section 636(c) governs whether the magistrate judge had statutory authority to conduct such proceedings. *Harris v. Polk Constr. Co.*, 138 F.3d 365, 370 (8th Cir. 1998).

"[T]he absence of consent from the parties to proceed before a magistrate judge, as set out in Section 636(c)(1), implicates the limits that Congress set on a magistrate judge's subject matter jurisdiction." *Burton*, 25 F.4th at 206; *see McNab*, 240 F.3d at 1328. Here, the parties never provided any kind of consent—oral or written—to the magistrate judge unilaterally conducting non-ministerial aspects of the trial.[4] The district judge asked for and received the "thoughts" of counsel on a limited "proposal" to have the magistrate judge carry out a purely ministerial task—

---

[4] The court minutes state that "Counsel for both Plaintiffs and counsel for Defendants consent to Judge Mizell accepting verdict." DE462; DE463. As noted, the absence of an objection from counsel is not the same as securing the knowing and voluntary consent of the parties. At any rate, the minutes do not say that counsel consented to the magistrate performing the role of an Article III judge for purposes other than accepting the verdict.

"receiving the verdict from the jury." DE535:13. That is not the same as seeking and obtaining "the consent of the parties" to have the magistrate judge unilaterally wield non-ministerial powers, such as instructing the jury or resolving substantive disagreements between the parties. *See Desir*, 257 F.3d at 1237-38; *De La Torre*, 605 F.2d at 155-56.

This is not one of the "narrowly circumscribed contexts" in which the parties' consent may be inferred from litigation conduct. *See Bismark*, 213 F. App'x at 895 (citing *Roell*, 538 U.S. at 586, 590). Whether express or implied, consensual relinquishment of a constitutional right "must be knowing and voluntary." *Burton*, 25 F.4th at 206. Any implied acquiescence here was not knowing and voluntary, for several reasons.

First, the district court did not give the parties an opportunity to confidentially withhold their consent. All three sources of law governing the consent procedure point to the importance of that safeguard. The Middle District of Florida's written consent form states: "The name of any party withholding consent will not be revealed to any judge who may otherwise be involved with your case." That directive implements "[t]he procedure created by 28 U.S.C. § 636(c)(2) and Rule 73(b)," which "envisions advance, written consent communicated to the clerk, the point being to preserve the confidentiality of a party's choice, in the interest of protecting an objecting party against any possible prejudice" or "the risk of reprisals

at the hands of either" the district judge or the magistrate judge. *Roell*, 538 U.S. at 586, 587 n.5; *see* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73(b)(1).

Second, the district court did not give counsel advance notice of its proposal. *See* Fed. R. Civ. P. 73(b)(1); *Roell*, 538 U.S. at 586. Timely notice would have afforded counsel an opportunity to consider the issue, confer with their clients, and provide the information and advice needed to make a knowing and voluntary decision on whether to relinquish a constitutional right. Some such opportunity was a prerequisite to securing the "consent of the *parties*," as opposed to the ad hoc thoughts of *counsel*. *See* 28 U.S.C. § 636(c)(1) (emphasis added); *Burton*, 25 F.4th at 209 ("[T]here is no ambiguity in the meaning of the term 'parties' in Section 636(c): It refers to the names on both sides of the 'v.'") (cleaned up). In this case, the record does not even disclose if any of the parties were present in the courtroom when the court solicited counsel's thoughts on its proposal. *See* DE462:1 (stating that "Judge Steele meets with counsel to discuss Magistrate Judge Mizell accepting verdict," but omitting any reference to the parties); DE535:13-14.

Third, the district court did not provide a contemporaneous warning "of the need for consent and the right to refuse it." *See Roell*, 538 U.S. at 590. It is no answer to note that a boilerplate warning was buried in a few documents filed as a matter of course years before the district court floated its proposal. *See* DE75:9; DE105:9. The statute provides that, after the time when the action is filed, "either

28

the district court judge or the magistrate judge may again advise the parties of the availability of the magistrate judge, but *in so doing, shall also advise the parties that they are free to withhold consent without adverse substantive consequences*." 28 U.S.C. § 636(c)(2) (emphasis added).  In this case, the district judge "propos[ed]" that the magistrate judge receive the verdict on November 17, 2021—almost five years after the case was filed.  DE535:13.  "[I]n so doing," neither the district judge nor the magistrate judge advised the parties or counsel of the need for consent; still less did they make clear that the parties were "free to withhold consent without adverse substantive consequences."  28 U.S.C. § 636(c)(2); *see* DE535:13-22.

If anything, the record shows that the parties had no real choice, and that an objection might well have triggered adverse consequences.  Just two days before the magistrate judge took over, the court threatened a mistrial if the trial went long and interfered with the court's plans.  *See* DE479:22-23 ("In terms of running out the clock, y'all know what the clock is….  And, if you run out, I'll see you next year.  We'll do it [i.e., the whole trial] again.").  And during the colloquy with counsel, the district judge stated:  "I didn't know of any other way, frankly."  DE535:14.  Such comments did not convey to counsel that the parties had a meaningful right to refuse consent.

In light of those and other considerations, this case is nothing like *Roell*.  It is one thing to say that a mere technical "defect" in a referral need not strip a magistrate

29

judge of jurisdiction, "so long as the parties have in fact voluntarily consented." 538

U.S. at 587. It is another thing to say that a referral may jettison virtually *all* the

procedures that Congress and the courts have crafted to ensure a knowing and

voluntary consent to the relinquishment of a constitutional right. *See id.* at 587, 591

n.7 (explaining that the procedures set out in § 636 and Rule 73 "are by no means

just advisory," and "district courts remain bound" to adhere to them).

The absence of a valid consent divested the magistrate judge of jurisdiction to

preside over the last three days of the trial, including critical phases preceding and

culminating in acceptance of the jury verdict on which the judgment is predicated.

*Burton*, 25 F.4th at 206. In such circumstances, this Court's precedents hold that the

proper remedy is to vacate the judgment and remand for a new trial. *Fowler*, 899

F.2d at 1096; *see also Desir*, 257 F.3d at 1238; *De La Torre*, 605 F.2d at 156.

## II.  The District Court Erred in Denying Defendants' Motion for Judgment as a Matter of Law as to the Trade Secret Claims.

### A.  The district court's post-trial order failed to specifically identify a trade secret that forms a legally permissible basis for the jury's verdict, and it could not properly assess the sufficiency of the evidence without identifying some such secret.

At every stage of this case, Defendants argued that (1) a bred animal itself

cannot be a trade secret, and (2) Plaintiff otherwise failed to satisfy statutory

prerequisites for pleading and/or proving that Defendants misappropriated specific

information that could count as a trade secret under the DTSA or FUTSA.

Defendants renewed those arguments in their post-trial motion for judgment as a matter of law. DE484:3-16.

The district court denied that motion and ordered API and Mr. Pearl to pay $9.9 million in damages based on Plaintiff's DTSA and FUTSA claims. DE553:55, 65. In doing so, however, the district court declined to (1) offer any rationale for holding that bred animals themselves—as opposed to information about those animals—can fall under the protection of the relevant trade secret statutes, or (2) otherwise identify a specific trade secret that, in the court's view, provided a legally permissible basis for the jury's verdict. *Id.* at 8-9.

That was no mere omission. Five years into the litigation, the best Plaintiff could do to identify its own "trade secret" was to propose fusing together tens of thousands of different animals it had once owned (and later abandoned at AMI's facility) with vaguely defined breeding-related information pertaining to, and purportedly contained within, those animals—and to characterize the resulting amalgamation as a *single* "trade secret": "Our trade secret *is* exactly what the jury found. It's the animals *and* the information contained in it. And that information specifically was which [shrimp] belonged to which family because then it's usable." DE592:35 (emphases added); *id.* at 11 ("Our trade secret is a combination of the shrimp and the information included in it.").

31

In its order denying Defendants' motion for JMOL, the district court could not bring itself to invoke—much less endorse—Plaintiff's considered formulation of its own trade secret. Instead, the court noted that it had "previously stated that Primo's alleged trade secrets may qualify as trade secrets if the finder of fact determined they met the statutory criteria in the DTSA and/or FUTSA." DE553:8. The court then stated: "There was sufficient evidence admitted at trial from which a reasonable jury could find that there was 'information' in this case which qualified as a trade secret under both federal and Florida law (see Doc. #489, p. 6, n. 5, 7) and that Plaintiff had knowledge of underlying genetics from the many thousands of breeding records received as exhibits and the testimony of certain witnesses." DE553:8-9.

That analysis is unpersuasive for several reasons.

First, the court's post-trial order did not specify a single trade secret that, in its view, provided a legally cognizable basis for liability. *See, e.g.*, *Composite Marine Propellers v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) ("It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets.").

Second, whether Plaintiff failed to identify a "trade secret" supplying a legally permissible basis for the jury's verdict presents a question of law for the court, not a

question of fact for the jury. *E.g.*, *Yellowfin Yachts v. Barker Boatworks*, 898 F.3d 1279, 1298-99 (11th Cir. 2018) (affirming district court's conclusion "that no reasonable jury could find that the Source Information constituted a trade secret," and rejecting plaintiff's argument that the district court "erred by conducting a fact-bound inquiry, better left for a jury"). It is no answer to say that "[t]he jury was instructed in large part by tracking the language of the statutes," DE553:8, because Defendants' position is that Plaintiff's asserted trade secret "cannot as a matter of law fall within the statutory definitions of 'trade secret' under state or federal law." DE306:39; DE378:5 n.2.

Third, the district court could not properly assess the sufficiency of the evidence—as to liability or damages—without specifically identifying the trade secret at issue. For that reason, it was not enough to cite its summary judgment order or Plaintiff's briefing for the proposition that "there was [unspecified] 'information' in this case which [could have] qualified as a trade secret"; Plaintiff was also required to prove, based on evidence adduced at trial, that the *same* "secret" was owned or possessed by Plaintiff, that Defendants misappropriated that secret (as opposed to using information in the public domain or that was reverse engineered), and that such misappropriation caused damages that were established to a reasonable degree of certainty. *See* 18 U.S.C. §§ 1836(b)(1), 1839(3)-(6); Fla. Stat. §§ 688.002, 688.004; *Peat v. Vanguard Research*, 378 F.3d 1154, 1158 (11th Cir. 2004)

(explaining that the plaintiff has "the burden of establishing each of these statutory elements as to each claimed trade secret").

The evidence needed to satisfy those elements turns on the specific trade secret asserted. *See, e.g.*, *Otogenetics Corp. v. Omega Biosciences*, No. 1:15-CV-2697, 2017 WL 11580438, at \*4 (N.D. Ga. 2017) ("Without knowing precisely what information Plaintiff is contending is a trade secret, the Court is at a loss for how to proceed in assessing whether Plaintiff even has protectable trade secrets."). "Because the District Court did not articulate with particularity the information to which it accorded trade secret status, [this Court is] unable to conduct an informed appellate review, assessing the alleged trade secret information against other" record evidence. *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 385 (3d Cir. 2021).

## B. The district court erred as a matter of law insofar as it allowed the jury to find that bred animals may be trade secrets.

Before trial, the district court recognized that Plaintiff's trade secret claims were based on the theory that the shrimp themselves were trade secrets. *E.g.*, DE378:2-3 ("Plaintiff and PB Legacy respond that the Amended Complaint, pleadings, and the evidentiary record before the Court show that unlawful disclosure and use of Plaintiff's trade secrets (broodstock shrimp) occurred after May 11, 2016 and continue to this day."). But "the Court decline[d] to hold that Primo's broodstock cannot as a matter of law fall within the statutory definitions of 'trade

secret' under state or federal law."  DE306:39 (quotation marks omitted); DE378:5

n.2.

That was error.

The DTSA provides:

[T]he term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

To satisfy that statutory definition, an asserted "trade secret" must be a form or type of "information."  A bred animal is not a form or type of information.[5] Consistent with dictionary definitions, an ordinary English user would refer to information *about* animals, but would not say that an animal itself *is* information.

---

[5] *E.g.*, Merriam-Webster, *Information*, https://www.merriam-webster.com/dictionary/information# (defining "information" as "knowledge obtained from investigation, study, or instruction").

Traditional tools of statutory interpretation confirm that conclusion. Although the statute does not define the term "information," it does include a list of the forms and types of "information" Congress had in mind when it sought to protect trade secrets. Those specific examples are nothing like animals. Indeed, inserting animals into that list would make no sense: Unlike the other listed items, for example, an animal cannot be "intangible" or "compiled" or "memorialized" "electronically," "graphically," or "in writing." *See Yates v. United States*, 574 U.S. 528, 539, 544-46 (2015) (Opinion of Ginsburg, J.) (applying canons of *noscitur a sociis* and *ejusdem generis*, and concluding that term "tangible object" did not include a "fish" for purposes of statute addressing "[d]estruction, alteration, or falsification of records"); *id.* at 550 (Alito, J., concurring in the judgment) ("[W]ho wouldn't raise an eyebrow if a neighbor, when asked to identify something similar to a 'record' or 'document,' said 'crocodile'?").

The canons invoked by the Supreme Court in *Yates* apply with greater force here. *Yates* held that a fish was not a "tangible object" for purposes of a statute addressing the destruction, alteration, or falsification of records, even though dictionary definitions of the pertinent terms supported a different conclusion. Here, dictionary definitions and interpretive canons both support the conclusion that "information" does not mean shrimp.

For purposes of the DTSA claim, the rule of lenity should apply even if there were doubt about whether shrimp are "information" within the meaning of § 1839(3), which defines the term "trade secret" for purposes of civil and criminal liability. *See* 18 U.S.C. § 1832 (making theft of a "trade secret" punishable by a prison term of up to 10 years); *Yates*, 574 U.S. at 547-48 (Opinion of Ginsburg, J.).

Like its federal analogue, FUTSA limits trade secret liability to the misappropriation of "information, including a formula, pattern, compilation, program, device, method, technique, or process." Fla. Stat. § 688.002(4). By that definition, a shrimp itself cannot be a "trade secret." *See, e.g.*, *North Carolina Farm Partnership v. Pig Improvement Co.*, 593 S.E.2d 126, 129, 130 (N.C. App. 2004) (quoting virtually identical definition under analogous North Carolina statute, noting absence of caselaw "involving the application of trade secrets law to animals," and quoting trial court's reasoning that "[b]ecause of the pig's genetic makeup, it may be a valuable pig, but it is not a trade secret.").

The district court "decline[d] to hold that Primo's broodstock cannot as a matter of law fall within the statutory definitions of 'trade secret' under state or federal law." DE306:39 (internal quotations omitted). Notably, however, the court did not ground that decision in an analysis of the statutory text. It did not, for example, point to any statutory or dictionary definitions suggesting that "broodstock shrimp" themselves may reasonably be deemed a form or type "of financial,

business, scientific, technical, economic, or engineering information." *See id.* at 34-39. Instead, the court noted that "Primo's broodstock *business* was premised on *knowledge* of the underlying Primo shrimp genetics, the manner in which its shrimp can be successfully bred for generations as broodstock, and the manner in which 'locked' pairs can be used to prevent customers from breeding such pairs as broodstock lines." *Id.* at 37. Before trial, the court ruled that "such information *may* qualify" as trade secrets under the DTSA and FUTSA. *Id.* But "such information"—information *about* certain shrimp—is not the same as the shrimp themselves.[6]

Assuming bred animals may count as trade secrets, undisputed record evidence precluded the jury from finding liability on that basis. "In a trade secret action, the plaintiff bears the burden of demonstrating both that the *specific information* it seeks to protect is secret and that it has taken reasonable steps to protect this secrecy." *Am. Red Cross v. Palm Beach Blood Bank*, 143 F.3d 1407, 1410 (11th Cir. 1998) (emphasis added). Primo's business was to sell its shrimp and

---

[6] In *Pioneer Hi-Bred Int'l v. Holden Found. Seeds*, Civ. No. 81-60, 1987 WL 341211, at *31 (S.D. Iowa Oct. 30, 1987) (unpublished), the district court concluded that the "genetic messages" of certain lines of corn were "trade secrets" for purposes of Iowa law. *See also Midwest Oilseeds v. Limagrain Genetics Corp.*, 231 F. Supp. 2d 942 (S.D. Iowa 2002). Whether a "genetic message" can be a trade secret presents an analytically distinct question from whether an animal itself can be a trade secret. *See infra.* Assuming *arguendo* that "genetic messages" may qualify as trade secrets under the laws at issue here, a plaintiff bringing such a claim must prove all the statutory elements of trade secret liability as to the specific messages claimed to be trade secrets. *See Peat*, 378 F.3d at 1158.

make them "widely known to the world," not to keep them secret.  DE479:101;  *see, e.g.*, *Turret Labs USA v. CargoSprint*, 2022 WL 701161, *3 (2d Cir. Mar. 9, 2022); *Farmers Edge v. Farmobile*, 970 F.3d 1027, 1033 (8th Cir. 2020).

In addition, record evidence established that Primo abandoned its shrimp on AMI's property.  If the shrimp themselves were the alleged trade secrets, then Primo could not assert continuing ownership or possession of those secrets *after* it abandoned them.   *See* 18 U.S.C. §§ 1836(b)(1), 1839(3)(A), (4); Fla. Stat. § 688.002(2).

### C. The district court erred insofar as it held that trade secret liability may be predicated on alleged misappropriation of a valid trade secret in "the underlying Primo shrimp genetics."

Plaintiff argued, and the district court apparently agreed, that trade secret liability could be predicated on Defendants' alleged misappropriation of "the underlying … shrimp genetics."  DE306:37.  As used in this case, however, that phrase obscures more than it reveals.  At various times in the proceeding below, testimonial and documentary evidence used the term "genetics" to refer to such vastly different things as (a) actual DNA sequences, including coding and noncoding regions of DNA; (b) knowledge of how Primo chose to group its shrimp into families for purposes of recordkeeping and breeding; and (c) actual shrimp themselves and/or their physical traits.[7]

---

[7] E.g., DE471:25-26, 39; DE473:22-23, 24, 28.

As explained below, Plaintiff failed to adduce legally sufficient evidence that any one of those things was a valid "trade secret" that was owned or possessed by Plaintiff and misappropriated by Defendants.  By conflating those things with the shrimp themselves and lumping them all together under the vague phrase "underlying shrimp genetics," however, Plaintiff invited the jury to mix and match statutory elements for different alleged trade secrets.  That "kitchen sink" approach to asserting trade secret liability, combined with the district court's refusal to require specificity or weed out statutorily impermissible theories of liability, resulted in multiple layers of reversible error.

### 1.    DNA sequences.

Discrete DNA sequences comprising genes may be thought to encode "information."   DE473:100; *see Association for Molecular Pathology v. Myriad Genetics*, 569 U.S. 576, 596 (2013).  In the proceeding below, however, Plaintiff did not identify any specific DNA sequence or sequences as alleged trade secrets.  That was no oversight.  DE489:8 n.9.  Any such claim would have failed for at least three independent reasons.

First, Primo did not isolate specific information about any of the genes found in the abandoned shrimp, and it cannot assert a "trade secret" consisting of unspecified "information" that Primo has never known.  Primo did not engage in genetic testing.  DE469:115.  Accordingly, Primo did not even have *meaningless*

"information" about raw sequences of nucleotide base pairs that comprise undifferentiated stretches of DNA (including coding and noncoding regions). Still less did Primo have *meaningful* genetic information about DNA sequences, such as knowledge of specific genes that code for proteins proven to contribute to disease resistance. DE474:126.

Second, Plaintiff did not meet its burden of demonstrating both that any "specific information" encoded in the DNA of the abandoned shrimp "is secret and that it has taken reasonable steps to protect this secrecy." *Am. Red Cross*, 143 F.3d at 1410. As noted, Primo was in the business of selling and marketing its shrimp, not keeping them secret; undisputed record evidence showed that anyone who bought those shrimp on the open market would thereby obtain precisely "such information" as Primo had (i.e., no specific information at all) about the DNA of the abandoned shrimp. *See* 18 U.S.C. § 1839(3)(A); Fla. Stat. § 688.002(4)(b). Indeed, any buyer or consumer could obtain *more* specific information than Primo had. *See supra* at 4-5.

Third, even if Primo had isolated specific and known "information" that was encoded in discrete DNA sequences and that could count as trade secrets, it was not the "owner" of any such "information" for purposes of the DTSA claim. *See* 18 U.S.C. § 1836(b)(1). "[T]he term 'owner', with respect to a trade secret, means the person or entity in whom or in which rightful legal or equitable title to, or license in,

the trade secret is reposed." *Id.* § 1839(4). Primo cannot, as a matter of law, claim "rightful legal or equitable title to, or license in," any and all "information" encoded in preexisting and naturally occurring DNA sequences that—by its own admission—Primo did not create or alter. *See Myriad Genetics*, 569 U.S. at 590-94; DE467:177; DE469:115. In addition, Plaintiff failed to identify any protectable information that differed from information encoded in the DNA of other shrimp, including but not limited to the shrimp obtained from Tin Corp.

It is no answer to say that Primo owned its shrimp (at least until it abandoned them), and the shrimp themselves "contained" specific DNA sequences which Primo never identified and of which it knew nothing. The DTSA and FUTSA protect "information." 18 U.S.C. § 1839(3); Fla. Stat. § 688.002(4). Temporary *physical* dominion over an individual animal does not, by itself, give an animal owner knowledge of—much less perpetual "intellectual property" rights to—any and all *information* that may be encoded in that animal's DNA. (Just as the physical owner of a book does not have an "intellectual property" right to the information contained in that book—either before or after abandoning the book on someone else's property.)

Nor could the law be otherwise. Almost all the DNA found in any one animal is also present in every other member of the same species; indeed, much of the DNA found in any animal is also found in members of different species. *See* David B.

42

Resnik, *DNA Patents and Human Dignity*, 29 J.L. Med. & Ethics 152, 158 (2001) (noting that "humans share up to 95 percent of their DNA with chimpanzees and as much as 50 percent of their DNA with yeast").

Even before the advent of modern genetic testing, the former Fifth Circuit rejected an argument that a plant's genetic code could be conceptualized as a trade secret. *Yoder Bros. v. Cal.-Fla. Plant Corp.*, 537 F.2d 1347, 1365 n.16 (5th Cir. 1976). "In one sense," the court reasoned, "the genetic code always remains a secret, *even to the breeder*." *Id.* (emphasis added). "In the more common sense, however, as soon as the plant is released, so are its secrets." *Id.* This Court's predecessor "prefer[red] the latter view as the one more in accordance with experience." *Id.* But both views lead to the same commonsense conclusion: Breeders do valuable work, and the law gives them a variety of tools to protect their labor (*see, e.g.*, DE20:21-28, 32-36); but a breeder may not assert ownership or possession of a "secret" consisting of "the genetic code" of a non-genetically-engineered organism, particularly where (as here) that code is a mystery to the breeder *and* the organism is released to others.

In short, Plaintiff failed to identify any actual and specific "genetic information" that forms a legally permissible basis for the jury's verdict. *See American Red Cross*, 143 F.3d at 1410 ("[P]laintiff bears the burden of demonstrating … that the specific information it seeks to protect is secret ….").

43

### 2.    Primo's family-grouping information

In the district court, Plaintiff argued that the specific "genetic information" that was misappropriated was "which [shrimp] belonged to which family." DE592:35; DE489:4; DE553:8.  That argument fails for several reasons.

*First*, Primo never conveyed, and Defendants never obtained, the specific information at issue.  Primo not only "withheld from AMI" information "as to which shrimp AMI had on its premises belonged to which Primo family line,"  DE466:17; DE467:129, 201-03; it purposefully "provided false information" about its families. DE469:120; DE474:159.

Plaintiff cannot fill that fatal gap in its proof by pointing to evidence that Defendants obtained, via genetic testing that Primo never did, actual "genetic information" that Primo never had.  As Plaintiff's own witnesses admitted, "Primo never engaged in DNA testing of [its] shrimp broodstock," so it never acquired any specific information encoded in the DNA of the abandoned shrimp.  DE469:115; *see* DE468:45-46.

It is no more persuasive to argue that Defendants used the information obtained from genetic testing to separate their shrimp (including but not limited to the shrimp that Primo abandoned) into related groups that may also be *called* "families," so as to avoid or minimize inbreeding, as did Primo.  As explained below, Defendants did not use the *same* grouping system that Primo utilized.

Consistent with common sense, Plaintiff's own evidence refutes the notion that there is only one way to group animals into "families" for purposes of recordkeeping and breeding decisions. At trial, for example, Plaintiff proffered Carlos Massad as an expert witness. DE473:120. Massad was tapped to serve as Primo's CEO in 2018. DE473:113. At that time, Primo asked the Center for Aquaculture Technologies (CAT) to do a genetic analysis of its shrimp. DE473:122. Based on CAT's report, Massad testified, one could have concluded that Primo had *somewhere between 9 and 12* "family lines" at that point in time, depending on the degree of "relatedness" used to define each "family." DE473:123, 161.

For example, Massad repeatedly testified that Primo "had 12 lines" when he came on board. DE473:123; *id.* at 161 ("[T]here were 12 . . . ."). But he also repeatedly testified that Primo then had "nine distinct families within [its] stocks." DE473:123; *id.* at 161 ("There were nine …."); *id.* ("[W]e had nine distinct families . . . ."). Massad explained that discrepancy by noting that some purportedly distinct lines "were closely related so … *it's kind of dicey there if we can call them different families*." DE473:161 (emphasis added).

In line with Massad's testimony, Doyle testified that animals should ordinarily be separated "into family *or family-like groups*" to proceed with a mating program and "to keep inbreeding to a minimum." DE474:114-15 (emphasis added); *id.* at 137 (testifying that "purebred" "doesn't refer to a single family"—"it's mating

45

within a group of families *that have been defined in some way* and where pedigree records are maintained") (emphasis added).

Any "family"-related information Defendants obtained from genetic testing was superior to—not just different than—the comparatively crude and imprecise data Primo compiled and maintained in its records. Neil Gervais, for example, thought that using PCR analysis to separate families "would have been a very valuable tool for Primo," but it would have taken "a lot of work" and been "very expensive," and "Ken decided" not to go down that road. DE468:46. After the events prompting this litigation, however, Primo changed its approach and started its own genomic program to identify families. Plaintiff's own expert (Massad) was "[a]bsolutely" of the view that the genomic program was "better." DE473:159. That stands to reason: If genomic testing revealed the same "information" that Primo already had, Primo would not have spent the time and money needed to develop such a program. *E.g.*, DE468:46; DE473:134.

In short, Plaintiff's evidence establishes that any actual "genetic information" Defendants obtained from DNA-based testing was not the same as any non-DNA-based information that Primo compiled or inferred by physically observing and/or subjectively grouping its shrimp. *A fortiori*, Plaintiff failed to meet its burden of proving that Defendants misappropriated the same "confidential information" that Primo had. *See, e.g., Otogenetics Corp.*, 2017 WL 11580438, at *6 (concluding that

plaintiff failed to specifically identify a trade secret that was misappropriated by defendants, and distinguishing case in which witnesses, including an expert witness, testified that the misappropriated information was a "copy" of and "virtually identical" to information "actually used" by defendants).

*Second*, even if the information gleaned from genetic testing was the same as the information Primo had about its family grouping system, such information could not, as a matter of law, qualify as a trade secret. As Plaintiff sees it, Defendants obtained the information Primo had about "families" by genetic testing. But if that were so, such information would be "readily ascertainable through proper means"— i.e., reverse engineering. *See* 18 U.S.C. § 1839(3)(B), (6)(B). At trial, Neil Gervais (Plaintiff's lead witness) testified that the genetic testing Dr. Perez did was "definitely" a kind of "reverse engineering." DE468:45; *id.* at 44. That testimony fulfilled a promise Plaintiff's counsel made to the jury at the start of trial: "The proof will show … [Defendants] used Dr. Franklin Perez to reverse engineer the families." DE466:22.

It is not persuasive to argue that the genetic testing at issue here was not reverse engineering under the "misappropriation" prong of the statute because AMI (which was not found liable on the trade secret counts) had a contractual duty to maintain the "secrecy" of information extractable from the abandoned shrimp. *See* 18 U.S.C. § 1839(6)(A). Even if that were so, the possibility that others could

engage in reverse engineering of the abandoned shrimp would still make the "genetic information" at issue "readily ascertainable" by "another person," thus precluding trade secret liability under § 1839(3)(B).

In addition, the jury found that Primo breached the GOA as originally entered or as modified by the Term Sheet (DE465:19), and ample record evidence supports that finding. *See supra* at 13. Under Florida law, that material breach excused AMI from any ostensible obligation under the GOA not to genetically test the shrimp that Primo abandoned at AMI's premises. *MDS (Canada) Inc. v. Rad Source Techs.*, 720 F.3d 833, 852 (11th Cir. 2013), *certified question answered*, 143 So. 3d 881 (Fla. 2014) ("Under Florida law, a material breach excuses a party from performance of the contract, although the injured party may waive the breach.").

*Third*, even assuming Primo adduced sufficient record evidence that it "had knowledge" of specific "famil[y]"-related information Defendants obtained from genetic testing—and not just some degree of unspecified knowledge about the "underlying genetics," whatever that means (DE553:8-9)—Primo cannot, as a matter of law, claim ownership of information encoded in the DNA of the abandoned shrimp. *See supra* at 40-43.

*Fourth*, a reasonable jury could not find that Primo took "reasonable measures" to keep secret any genetic information that could be extracted from the shrimp in question—because *Primo abandoned those shrimp on AMI's premises*.

*See* 18 U.S.C. § 1839(3)(A); *Yoder Bros.*, 537 F.2d at 1365 n.16 (reasoning that "as soon as the [organism] is released, so are its secrets"). After the parties signed the Term Sheet, Primo had a full three months to remove its shrimp from AMI's facility. But Primo "did nothing for the next two or three months," DE479:125, and it wound up removing only 20,000 or so of the 100,000 shrimp in question. DE471:138.

Ken Gervais testified that Primo didn't remove the shrimp because "[w]e didn't have the space to put them anyplace else." DE469:57. But that was not an "unforeseen" circumstance (DXF:3) in January *or* April 2016; after all, Primo "required more grow-out space" in 2014, which was what "brought Primo into discussions with AMI" in the first place. DE306:3. Nor does Primo's asserted lack of space on its own property explain why it failed "to remove all animals" from AMI's property by April 30, 2016 (DXC); Primo could have removed and disposed of the shrimp—and thereby relieved AMI of the significant costs of maintaining them—without housing them on Primo's own premises.

Primo's assumption that AMI would kill the shrimp (DE469:58) also does not suffice to prove "reasonable" efforts. AMI promised, without temporal limitation, that it "will *not* destroy [the] animals" in the signed Term Sheet (DXC, emphasis added); AMI had a right—and arguably a duty—to mitigate millions of dollars in damages resulting from Primo's serial breaches of the GOA and Term Sheet

49

(DE472:22-23); and genetic information may be gleaned from killed as well as live shrimp—and even from legs of killed shrimp (DE473:122; DE474:90-91, 128).

In sum, Plaintiff failed to adduce legally sufficient evidence supporting liability based on its purported trade secret in the information Primo used to group its shrimp into families for purposes of breeding and recordkeeping.

***

Animals themselves are not "information," and Plaintiff failed to adduce legally sufficient evidence proving that Defendants misappropriated specific information that Primo owned or possessed at the time and that counts as a trade secret.  Needless to say, Plaintiff's attempt to *verbally* fuse together tens of thousands of animals with vaguely defined "information" pertaining to those animals does not make the resulting amalgamation a legally cognizable trade secret.  *See* DE592:35.

## III.   The District Court Erred in Allowing a Double Recovery.

"The Supreme Court has instructed that 'the courts can and should preclude double recovery by an individual.'"  *St. Luke's Cataract & Laser Inst.*, 573 F.3d at 1203 (quoting *Gen. Tel. Co. Nw. v. U.S. Equal Emp. Opportunity Comm'n*, 446 U.S. 318, 333 (1980)).  "[I]f a federal claim and a state claim arise from the same operative facts, and seek identical relief, an award of damages under both theories

will constitute double recovery." *Medina*, 643 F.3d at 328 (quoting *Mason v. Okla. Turnpike Auth.*, 115 F.3d 1442, 1459 (10th Cir. 1997)).

That is hornbook law.[8]  Applying such law to undisputed facts, the duplicative awards for Plaintiff's duplicative trade secret claims constitute an impermissible double recovery.

*First*, Plaintiff's federal and state trade secret claims "arise from the same operative facts."  Those claims are set out in Counts IV and V of the Amended Complaint, which include *verbatim* copies of the pertinent factual allegations. *Compare* DE20 ¶¶ 142-44 (Count IV), *with id.* ¶¶ 147-49 (Count V); *see Medina*, 643 F.3d at 326 (inquiring whether the "damages award represented compensation for two distinct injuries," and noting that "the simplest way to pinpoint the injury [plaintiff] suffered is by looking at his complaint").  In addition, the parties' arguments and the district court's jury instructions reflect that this case was tried on the assumption that the federal and state claims were essentially identical. *See, e.g.*, DE456:26-39; DE489:3-15.

*Second*, Plaintiff's federal and state claims "seek identical relief"—"an injunction," "an award of actual damages," "additional enhanced damages" due to "willful and malicious misappropriation," "costs of this action," "pre- and post-

---

[8] *E.g.*, 22 Am. Jur. 2d Damages § 40 & n.10 (2023); Federal Trial Handbook: Civil § 25:8 (2022-2023 ed.).

judgment interest," and "attorneys' fees."  DE20 ¶¶ 145, 151.  In addition, both claims allowed the same kinds of damages and the same method of computation— "either" the amount of "actual damages" and "unjust enrichment" or "a reasonable royalty."  DE456:32 (federal claim); *id.* at 39 ("The instructions I gave you concerning the federal trade secret claim regarding these damages also govern damages under the Florida trade secret statute.").

*Third*, the district court's judgment includes "an award of damages under both theories"—"$4,950,000 compensatory damages" against API and Mr. Pearl "for violation of the federal Defend Trade Secrets Act" (DE554:3, Count IV), and a separate "$4,950,000 compensatory damages" award against API and Mr. Pearl "for violation of the Florida Trade Secrets Act" (DE554:3, Count V).

The court's instructions to the jury provide additional support for that conclusion.  As a general principle, "a jury is not prohibited from allocating a single damages award between two distinct theories of liability."  22 Am. Jur. 2d Damages § 40.  But the jury in this case was not told that it could or should allocate a single damages award between different theories of liability.  Just the opposite:  It was told not to do that.  The instruction on each of the two trade secret counts advised the jury that it "*should* award TB Food an amount of money that a preponderance of the evidence shows will fairly and adequately compensate TB Food for *the damage*

*legally caused by defendants' misappropriation of the trade secrets*."  DE456:32 (emphases added); *id.* at 38 (same).

That damage was the same for the federal and state counts:  Same alleged trade secret; same alleged misappropriation; same alleged injury; and same instructions for computing damages.  *See* DE456:26-39; DE465:7-13; DE553:54-56.  As instructed, therefore, the jury "should" have found the same "legally caused" damage for both claims and specified that sum in Counts IV and V of the verdict form.  DE456:32, 38.  That is just what it did.  DE465:9, 12 (¶¶ 27, 39).

As to the DTSA claim, the court instructed the jury:  "To the extent it is not duplicative (that is, double counting), you may award either … the amount … of actual damages … and … unjust enrichment … OR … the amount of a reasonable royalty."  DE456:32.  As the context makes clear, the "duplicative" or "double counting" language clarifies how to compute damages *within* the DTSA claim; it does not tell the jury to avoid duplicative or double recovery between claims, and still less does it allow the jury to apportion "the damage legally caused by defendants' misappropriation of the trade secrets" between the DTSA and FUTSA claims.  Indeed, the instruction merely reflects the DTSA's statutory text.  18 U.S.C. § 1836(b)(3)(B)(ii) (allowing damages of a reasonable royalty "in lieu of damages measured by any other methods"); *see also* Fla. Stat. §§ 688.004(1) (allowing damages of reasonably royalty "[i]n lieu of damages measured by any other

methods"). Any residual doubt on that issue is dispelled by this Court's pattern jury instruction on trade secrets misappropriation—which applies even when a case involves only a DTSA claim and includes the same instruction. *See* Pattern Jury Instruction 11.4 (Mar. 10, 2022).

The district court ruled that "the award for compensatory damages under the DTSA and FUTSA is not duplicative because the damages awarded do not exceed actual damages." DE553:54. The court erred in several ways.

First, the court applied the wrong legal test. It is true that "[a] double recovery occurs when the damages awarded on two or more claims stemming from the same conduct exceeds the actual damages" that could have been found by a reasonable jury. DE553:4 (citing *Democratic Republic of the Congo v. Air Capital Grp.*, 614 F. App'x 460, 474 (11th Cir. 2015)). But this Court's unpublished opinion in *Air Capital Group* does not say that is the *only* circumstance in which a double recovery "occurs." And a more specific rule applies here: "[I]f a federal claim and a state claim arise from the same operative facts, and seek identical relief, an award of damages under both theories will constitute double recovery." *Medina*, 643 F.3d at 328 (quoting *Mason*, 115 F.3d at 1459).

Unlike this case, *Air Capital Group* involved different amounts awarded on substantially different theories of liability—$1,175,415.04 for breach of contract, $362,707.03 for fraud, and $720,848.04 for a state-law FDUTPA violation. 614 F.

54

App'x. at 465, 473-74.  Thus, the Court there had no occasion to address the distinct problem that arises when the exact same amount is awarded twice on two practically indistinguishable theories of liability.

Second, the district court erred insofar as it adopted a legal presumption that two awards cannot give rise to a double recovery if a reasonable jury could have awarded a total amount comprised of both awards added together—regardless of how the jury was instructed, how similar the claims and proof elements at issue, and whether and to what extent the record evidence also could have supported a lesser amount of damages.  DE553:54-57.  Notably, the court did not find that a reasonable jury could not have fixed the total amount of damages for both trade secret claims at $4,950,000.  Nor did the court point to any specific basis for finding that the jury's verdict evinced an intent to apportion the total damages amount between the federal and state trade secret claims.  *Compare Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300, 1319 (11th Cir. 2014) (rejecting argument that the jury award reflected duplicative damages where "in light of the instructions to the jury, the verdict form, and the evidence, it is clear that the jury intended" the total amount of damages awarded by the district court).  And, even if it had, any such finding would have been clearly erroneous based on the considerations noted above.

Assuming *arguendo* that the jury's verdict form is susceptible to more than one interpretation, the magistrate judge erred in not seeking clarification from the

jury on its intent.  The proper time to clarify an ambiguous verdict is before the jury is discharged.  *See, e.g.*, *Consol. Energy*, 860 F.3d at 147.  Prior to acceptance of the verdict, the parties expressly disputed how the jury's damages award should be interpreted.  Instead of seeking clarification, the magistrate judge discharged the jury.  (*See supra* at 22-25.)  Once made, that decision could not be undone.

## CONCLUSION

Because the magistrate judge lacked authority to preside over critical phases of the trial, the judgment should be vacated and the case remanded for a new trial.  In the alternative, the Court should reverse the judgment as to Counts IV and V and remand with instructions to enter judgment for API and Mr. Pearl as well as AMI.  Otherwise, the duplicative compensatory damages awards should be reversed as an impermissible double recovery.

*Signature on Next Page*

Respectfully submitted,


 */s/ Amit Agarwal*_____
Amit Agarwal
Brent Cooper
HOLLAND & KNIGHT LLP
315 South Calhoun Street, Suite 600
Tallahassee, FL 32301
(850) 425-5611

Steven E. Jedlinski
150 North Riverside Plaza
Suite 2700
Chicago, IL 60606

Sarah Molinoff
601 SW Second Avenue
Suite 1800
Portland, OR 97204

*Counsel for Appellants/Cross-Appellees
American Mariculture, Inc., American
Penaeid, Inc., and Robin Pearl*

## <u>STATEMENT OF COMPLIANCE</u>

1.      This brief complies with the word count specified by Eleventh Circuit Rule 32(a)(7)(B) because it contains 12,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 14 point font.

March 7, 2023

*/s/ Amit Agarwal*
Amit Agarwal

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of March, 2023 the foregoing

Initial Brief of Appellants/Cross-Appellees has been electronically filed using the

ECF filing system which will send notice of electronic filing to all counsel

registered to receive such notice. The foregoing initial brief is also being served

upon the following by first-class mail:

Brian Gargano
Jiangang Ou
Archer & Greiner, PC
3040 Post Oak Blvd. Ste. 1800-150
Houston, TX 77056

Theodore Geiger
Law Office of Theodore Geiger
477 Madison Ave. Fl. 6
New York, NY 10022

Steven R. Jakubowski
Robbins Salomon & Patt, Ltd
180 N LaSalle St. Ste. 3300
Chicago, IL 60601

Matthew Roepstorff
GrayRobinson, PA
1404 Dean St. Ste. 300
Fort Myers, FL 33901

Sheryl S. Zust
Law Office of Sheryl S. Zust
4649 S Lyde Morris Blvd. Ste. 610
Port Orange, FL 32129

Justin B. Mazzara
Pavese Haverfield Dalton Harrison &
Jensen, LLP
PO Drawer 1507
Fort Myers, FL 33902-1507

Chene Marie Thompson
Pavese Law Firm
Firm: (239) 334-2195
1833 Hendry St.
Fort Myers, FL 33901-3054

Nina Christine Welch
Cole Scott & Kissane, PA
222 Lakeview Ave. Ste. 120
West Palm Beach, FL 33401

Asher Knipe
George Hayward Knott
Knott Ebelini Hart
1625 Hendry St. Ste. 301
Fort Myers, FL 33901-2920

*/s/ Amit Agarwal*

Amit Agarwal

*Counsel for Appellants/Cross-Appellees*
*American Mariculture, Inc., American*
*Penaeid, Inc., and Robin Pearl*